# UNITED STATES DISTRICT COURT

for the

DISTRICT OF COLUMBIA

In the Matter of the Search of

ONE MOBILE PHONE AND THREE PIECES OF
LUGGAGE LOCATED IN THE DISTRICT OF
COLUMBIA UNDER RULE 41

Case No. 23-sw-392

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property

See Attachment A, hereby incorporated by reference.

located in the ___Jurisdiction of the___ District of ___Columbia___ , there is now concealed

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 1349 | Conspiracy |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1708 | Theft of Mail |
| 18 U.S.C. § 1425 | Unlawful Procurement of Citizenship |

The application is based on these facts:

See attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Mark Montoya*

*Applicant's signature*

Special Agent Mark Montoya, U.S. Postal Service-OIG

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone

Date: 11/20/2023

*Judge's signature*

City and state:  Washington, DC

Moxila A. Upadhyaya, United States Magistrate Judge

*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| ONE MOBILE PHONE AND THREE PIECES OF | ) Case No.  23-sw-392 |
| LUGGAGE LOCATED IN THE DISTRICT OF | ) |
| COLUMBIA UNDER RULE 41 | ) |
| | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ___Jurisdiction of the___ District of ___Columbia___

See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before ___December 4, 2023___
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___Moxila A. Upadhyaya___ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   ___11/20/2023___                    _____
                                                                                        *Judge's signature*

City and state:   ___Washington, DC___                    ___Moxila A. Upadhyaya, United States Magistrate Judge___
                                                                                        *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  23-sw-392 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____


                      _____
                                     *Executing officer's signature*

                      _____
                                       *Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched are the following items:

1. One Black Samsung mobile phone with a black phone case, IMEI: 354685321111858 and no visible serial number, hereinafter, "TARGET DEVICE."

2. Three (3) blue TACH pieces of luggage (carryon, medium and large), hereinafter, "LUGGAGE."

The TARGET DEVICE and LUGGAGE are currently stored by the Treasury Inspector General for Tax Administration, located at 1111 Constitution Avenue, NW, Room 2013, Washington, D.C. 20224.

**ATTACHMENT B**

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to the commission of violations of   18 U.S.C. §§ 371 (Conspiracy); 1344 (Bank Fraud); 1349 (Conspiracy); 1708 (Theft of Mail); and 1425 (Unlawful Procurement of Citizenship) (the "TARGET OFFENSES"), as described in the search warrant affidavit, including, but not limited to call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data that contain, constitute evidence of, document, establish, identify, or reflect:

   a.   Establishing or documenting the commission of the TARGET OFFENSES;

   b.   Identifying locations where the individual(s) committed the TARGET OFFENSES, traveled to before and after the commission of the TARGET OFFENSES, and in preparation for the TARGET OFFENSES;

   c.   Reflecting the ownership and use of the item identified in Attachment A by the individual(s) committing the TARGET OFFENSES;

   d.   Documenting meetings and communications between individuals committing one or more of the TARGET OFFENSES;

   e.   Reflecting communications between the individual(s) committing one or more of the TARGET OFFENSES and other individuals, discussing the commission of one or more of the TARGET OFFENSES;

f.  Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals who may have assisted or provided support in the commission of one or more of the TARGET OFFENSES;

g.  Containing photographs or video that would constitute evidence of a violation of the TARGET OFFENSES;

h.  Documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband in violation of the TARGET OFFENSES;

i.  Any records and information relating to financial transactions, checks, tax refunds, bank accounts, service routes;

j.  Records and information related to the email addresses, phone numbers, social media, account identifiers used by perpetrators, aiders and abettors, co-conspirators, and accessories after the fact concerning the TARGET OFFENSES;

k.  Evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

l.  Evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

m.  Evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

n.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

o.  Evidence of the times the Device(s) was used;

p.  Passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

q.  Documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

r.  Records of or information about Internet Protocol addresses used by the Device(s); and

s.  Records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF ONE MOBILE PHONE AND THREE PIECES OF LUGGAGE LOCATED IN THE DISTRICT OF COLUMBIA UNDER RULE 41** | **SW No. 23-sw-392** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Mark Montoya, a Special Agent with the United States Postal Service, Office of Inspector General ("USPS OIG"), being duly sworn, depose and state that:

## INTRODUCTION

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, specifically, One black Samsung mobile phone with a black phone case, IMEI: 354685321111858 and no visible serial number, hereinafter, "TARGET DEVICE" and three pieces of blue TACH luggage (carryon, medium and large) (hereinafter "LUGGAGE") which are in the possession of law enforcement and stored by the Treasury Inspector General for Tax Administration, located at 1111 Constitution Avenue, NW, Room 2013, Washington, D.C., 20224.  Such a search would include an examination of the TARGET DEVICE and LUGGAGE for information described in Attachment B.

2.     Unless otherwise noted, wherever in this affidavit I assert that a statement was made, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

3.     Unless otherwise stated, the conclusions and beliefs I express in this affidavit are

based on my training, experience, and knowledge of the investigation, and reasonable inferences I've drawn from my training, experience, and knowledge of the investigation.

## AFFIANT BACKGROUND

4.      I am a Special Agent with the United States Postal Service, Office of Inspector General ("USPS OIG") and have been since 2004.  I am assigned to a territory that covers parts of Washington, D.C., and Montgomery County, Maryland, to investigate Mail Theft at the Capital Heights, Maryland Domicile.  My assignments include investigating employees and contractors of the USPS who are involved in mail theft and other federal violations.  I have received specialized training and have participated in investigations relating to individuals who have stolen USPS mail, generally, counterfeited and/or altered official documents, forged and/or uttered financial documents, and committed identity theft. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

6.      Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 371 (Conspiracy); 1344 (Bank Fraud); 1349 (Conspiracy); 1708 (Theft of Mail); and 1425 (Unlawful Procurement of Citizenship) (the "TARGET OFFENSES") have occurred. There is also probable

2

cause to search the TARGET DEVICE and LUGGAGE, further described in Attachment A, for the things described in Attachment B.

### IDENTIFICATION OF THE DEVICE AND LUGGAGE TO BE EXAMINED

7.     The property to be searched are:

    a.   One Black Samsung mobile phone with a black phone case, IMEI: 354685321111858 and no visible serial number, hereinafter, "TARGET DEVICE;" and

    b.   Three (3) blue TACH pieces of luggage (carryon, medium and large), hereinafter, "LUGGAGE."

The TARGET DEVICE and LUGGAGE were recovered from HACHIKOSELA MUCHIMBA ("MUCHIMBA") at Dulles International Airport as he was waiting to board an overseas flight and is now currently stored by the Treasury Inspector General for Tax Administration, located at 1111 Constitution Avenue, NW, Room 2013, Washington, D.C., 20224.

### PROBABLE CAUSE

8.     The USPS OIG is investigating a series of mail thefts at the Friendship Post Office Station located at 4005 Wisconsin Avenue NW, Washington, DC 20016.  In January 2023, a postal customer who resides in Washington, D.C., reported his U.S. Treasury check was stolen from the mail and fraudulently negotiated.  At around the same time, law enforcement identified five U.S. Treasury checks that had been fraudulently negotiated into an account at TD Bank (x-1517).

9.     On January 3, 2023, a postal customer ("W-1") provided me with a copy of a U.S. Treasury check in the amount of $14,304.82 that was written pay to the order of "Hachikosela Khose Muchimba, **** Hayes Street NE, Apartment *, Washington, DC 20019-1804."  This check was supposed to be addressed to W-1 (and payable to W-1) but W-1 had never received

the check.  This check was endorsed on the back pay to the order of "Double Blue Investments" and deposited via mobile application on September 7, 2022, into TD Bank account x-1517.



*Picture 1- Front of Check*



*Picture 2 - Back of Check*

10.    W-1 recognized the name and the address on the U.S. Treasury check as the same name and address that W-1's mail carrier had used on a holiday card.  According to this customer, this USPS mail carrier provided holiday cards to the residents on his mail route in December 2022. W-1 showed me the mailing label that appeared on the holiday card from his mail carrier.



*Picture 3 - Photograph of Mailing Label*

11.    On January 12, 2023, I learned from TD Bank that account x-1517 belongs to "Double Blue Investments LLC" (TIN: x-0832) with an address at **** Hayes Street NE, Apt *,

Washington, D.C. 20019.  Account x-1517 was opened on October 5, 2021, at the TD Bank branch located at Rhode Island Place in Washington, D.C.  The customer who opened the account was HACHIKOSELA MUCHIMBA (DOB: xx/xx/1980; SSN: x-3502).

12.     During this investigation, TD Bank provided me with copies of four additional U.S. Treasury checks that were fraudulently negotiated into TB Bank account x-1517. These checks were all written pay to the order "Hachikosela Khose Muchimba, **** Hayes St NE, Apt *, Washington, DC 20019-1804."   The back of each of these checks were also endorsed pay to the order of "Double Blue Investments."   TD Bank provided a U.S. Treasury Check Reclamation Statement for each of these checks that identifies the victim whom this check was originally written to and the amount of the stolen U.S. Treasury check that was fraudulently negotiated.  The amounts of these four additional U.S. Treasury checks and the dates they were deposited into account x-1517 were as follows:

| CHECK NUMBER | DEPOSIT DATE | AMOUNT |
|---|---|---|
| 4041-82505263 | 12/13/2021 | $30,495.15 |
| 4045-02544139 | 7/18/2022 | $2,934.96 |
| 4045-04230290 | 8/2/2022 | $18,362.00 |
| 4045-04899401 | 8/16/2022 | $2,275.96 |

In my training and experience, someone removed the name of the original payee information for these four U.S. Treasury checks and the check provided by W-1—possibly through a process dubbed "washing" discussed further below—and replaced that information with MUCHIMBA's name and address.

5

13.     During this investigation, I have obtained and reviewed other bank records for TD Bank account x-1517 opened by MUCHIMBA in the name of Double Blue Investments.   On or about August 18, 2022, another U.S. Treasury check (No. 4045-04230293) was deposited into account x-1517 in the amount of $53,691.82 at an ATM.   However, the name and address for the original payee was not removed from this check when it was deposited into account x-1517.   The mailing address for this original payee was in Washington, D.C.



*Picture 4 - ATM Deposit on 8/18/2022 into Account x-1517*

14.     During this investigation, I have also obtained surveillance photographs from TD Bank that appear to depict the same person making multiple ATM transactions with account x-1517.   For example, TD Bank provided a picture of the individual who deposited U.S. Treasury check number 4045-04230293 in the amount of $53,691.82 on August 18, 2022.



*Picture 5 - Photograph from 8/18/2022 ATM Deposit*

15.     TD Bank also provided a surveillance photograph of the same person withdrawing

$1,000 from account x-1517 on four subsequent dates: September 20, 2022; September 22, 2022;

September 28, 2022; and October 6, 2022.  In three of these surveillance photographs, the person

appears to be wearing U.S. Postal Service clothing typically worn by employees.



*Picture 6 - $1,000 ATM Withdrawal on 9/20/2022*



*Picture 7 - $1,000 ATM Withdrawal on 9/20/2022*



*Picture 8 - $1,000 ATM Withdrawal on 9/28/2022*



*Picture 9 - $1,000 ATM Withdrawal on 10/6/2022*

16.     Based on my review of known photographs of MUCHIMBA, I believe that the person who made the ATM transactions in the foregoing pictures was MUCHIMBA. MUCHIMBA is also the only person who is authorized to make transactions in TD Bank account x-1517 which MUCHIMBA opened in the name of Double Blue Investments.

## MAIL THEFT

17.     MUCHIMBA began employment at the USPS as a mail carrier on February 16, 2020, at the Friendship Post Office Station located at 4005 Wisconsin Avenue NW, Washington, D.C. MUCHIMBA's home address on record at the USPS is **** Hayes St NE, Apt. *, Washington, D.C. 20009.  His date of birth is x/x/1980, and his Social Security Number is XXX-XX-3502. His assigned mail route at the Friendship Post Office Station has been route 23 since January 31, 2021.

9

18.     On or about January 5, 2023, a postal vehicle containing surveillance equipment was utilized at the Friendship Station to observe MUCHIMBA while he delivered mail. Surveillance images of MUCHIMBA were obtained while he was operating this vehicle on three different days during January 2023.



*Picture 10 - 1/6/2023 Mail Delivery*



*Picture 11 - 1/10/23 Mail Delivery*



*Picture 12 - 1/11/2023 Mail Delivery*

19.     I completed an analysis to determine how MUCHIMBA came into possession of the six U.S. Treasury checks referenced earlier in this affidavit.  Five of these checks were originally addressed to customers assigned to mail route 23 which is MUCHIMBA's delivery route.  One check was addressed to a customer who does not live on MUCHIMBA's mail route but whose mail is delivered by a different mail carrier who works at the Friendship Post Office Station.  I believe this unknown mail carrier is a co-conspirator working with MUCHIMBA.

**BANK FRAUD**

20.     It has been my experience with investigating mail theft cases that stolen U.S. Treasury checks are frequently used to defraud banks.  A stolen U.S. Treasury check can be "washed" so that new fraudulent payee information can be entered on the checks.  I believe the U.S. Treasury checks discussed in this affidavit appear to have been "washed" by MUCHIMBA using the same type of label that MUCHIMBA utilized for the holiday cards he provided to the postal customers on his mail route. Evidence of such a label can be seen on two of the checks fraudulently deposited in account x-1517 by MUCHIMBA that were deposited via mobile application.  Specifically, a faint but obvious line appears just above MUCHIMBA's name that would not typically appear on a U.S. Treasury check.

11



*Picture 13 - Check with Evidence of Washing Highlighted*



*Picture 14 - Check with Evidence of Washing Highlighted*

21.     The total amount of the U.S. Treasury checks referenced in this affidavit that were fraudulently deposited into MUCHIMBA's account at TD Bank in the name of Double Blue Investments is $122,065.71.

22.     Law enforcement executed a search warrant at MUCHIMBA's personal residence on March 29, 2023. In the course of that search, law enforcement recovered an ATM receipt that reflected a deposit of a U.S. Treasury Check in the amount of $415,173.53 into the Sandy Spring Bank account x8901.

12



Picture 12 – ATM Receipt Recovered March 29, 2023

23.     On March 24, 2023, a U.S. Treasury Check in the amount of $415,173.53 was deposited into the Sandy Spring Bank account x8901. MUCHIMBA controlled Sandy Spring Bank Account x8901 and MUCHIMBA was the only person authorized to make transactions with that Account.

24.     The U.S. Treasury check depicted in the ATM receipt was addressed to a person who is not MUCHIMBA. The intended recipient of this check did not authorize MUCHIMBA to possesses this check or to deposit the check into MUCHIMBA's bank account.

25.     The investigation has revealed that MUCHIMBA controlled bank accounts at eight financial institutions: Sandy Spring Bank, TD Bank, Capital One, Citibank, JP Morgan Chase, Digital Credit Union, Ally Bank, and NBKC Bank and he deposited approximately 98 misappropriated checks into those accounts with an aggregate value of $1,697,909.52. At least 90 of those misappropriated checks were U.S. Treasury checks.

**OTHER TARGET OFFENSES**

26.     During this investigation, investigators have learned that MUCHIMBA has deposited stolen treasury checks into TD Bank account x-1517 which were intended for delivery to D.C. residents whose postal carriers work with MUCHIMBA at the Friendship Post Office Station and Georgetown Carrier Station both located in the same postal facility; that is, certain of these checks were addressed to postal customers on the routes of these postal carriers who worked with MUCHIMBA.  In reviewing MUCHIMBA's financial records, investigators have identified multiple Zelle payments from MUCHIMBA to the postal carriers who would have had custody of those U.S. Treasury checks.  Accordingly, there is probable cause to believe that one or more additional postal workers may be involved in stealing treasury checks that MUCHIMBA deposited into TD Bank account x-1517.  It is reasonable to think that MUCHIMBA and other conspirators may have committed violations of 18 U.S.C. §§ 371 and 1349.

27.     During this investigation, I have also learned that MUCHIMBA became a naturalized U.S. citizen in or about May 2022.   In the process of becoming a naturalized citizen, MUCHIMBA was required to attest that he had never "committed, assisted in committing, or attempted to commit, a crime or offense for which [he was] NOT arrested."  As described above, MUCHIMBA deposited a stolen treasury check into TD Bank account x-1517 on or about December 2021.  Accordingly, there is probable cause to believe that MUCHIMBA may have made a false attestation in his application for citizenship which, if the truth were known, may have precluded him from obtaining naturalized citizenship; this conduct would violate 18 U.S.C. § 1425 (Procurement of citizenship or naturalization unlawfully).

**PRIOR SEARCH WARRANTS AND SEIZURE WARRANTS**

28.     On or about April 6, 2023, law enforcement agents executed a search warrant at MUCHIMBA's residence in the District of Columbia. Amongst the items law enforcement agents recovered were four electronic devices and a backpack, for which a search warrant was obtained in the District Court for the District of Columbia.

29.     On or about August 29, 2023, in the District Court for the District of Columbia the United States filed a civil forfeiture lawsuit against $402,669.95 in funds seized pursuant to a seizure warrant for funds in Sandy Spring Bank account x-8901 and controlled by MUCHIMBA. *See United States v. $402,669.95*, Case No. 23-cv-02527 (RC), ECF No. 1.

**MUCHIMBA's ARREST**

30.     On or about September 19, 2023, law enforcement learned that MUCHIMBA had purchased an airline ticket for destination to Zambia, via Ethiopian Airlines, leaving on or about September 20, 2023, out of Dulles International Airport.

31.     On September 19, 2023, in the District Court for the District of Columbia the United States filed under seal a Criminal Complaint against MUCHIMBA for bank fraud, in violation of 18 U.S.C. § 1344 and theft of mail, in violation of 18 U.S.C. § 1709 and obtained an arrest warrant for MUCHIMBA. *See United States v. Hachikosela Muchimba*, Case No. 23-AW-257 (RMM), ECF Nos. 1-2.

32.     On September 20, 2023, law enforcement executed the arrest warrant against MUCHIMBA at Dulles International Airport located at 1 Saarinen Cir, Dulles, VA 20166.  At the time that law enforcement executed the arrest of MUCHIMBA, he was standing at Gate B42, at Dulles International Airport waiting to board an overseas flight.

33.     Law enforcement detained MUCHIMBA and seized his mobile phone, which he was using while being detained. MUCHIMBA requested to make an outgoing call using the seized mobile phone, which was denied.  Furthermore, law enforcement seized from MUCHIMBA's person, his Zambia passport, wallet, and two boarding passes he was issued for flight number ET0501, Dulles Airport, VA to Addis Ababa, Ethiopia, and connecting flight number ET0863, Addis Ababa, Ethiopia to Lusaka, Zambia.  In addition, law enforcement seized one (1) blue TACH carryon luggage which was in MUCHIMBA's possession. Once MUCHIMBA was detained and transported to the airport security office, Dulles airline personnel retrieved two (2) additional matching pieces of blue TACH luggage checked in by MUCHIMBA prior to his flight and released them to law enforcement. MUCHIMBA confirmed that he owned all three pieces of luggage, and advised law enforcement that he had cash stored in the seized luggage. An inventory search of the luggage was conducted and $2,000 in U.S. currency was recovered. Law enforcement recovered that mobile device, which was the TARGET DEVICE and the three pieces of LUGGAGE described in Attachment A.

34.     On September 20, 2023, law enforcement recovered the TARGET DEVICE and LUGGAGE in Attachment A and transported them to 1111 Constitution Avenue NW, Room 2013, Washington, D.C. 20224, where the items are currently being held while the Court considers this application for a warrant.

## THE TARGET DEVICE AND LUGGAGE

35.     In your affiant's training and experience, and the training and experience of others at USPS OIG, investigating the statutes underpinning probable cause, subjects who engage in mail fraud, bank fraud, and related financial fraud schemes and conspiracies generate records relevant to those schemes and conspiracies, including for example: records of communications between

subjects/co-conspirators discussing execution of the scheme, how to best execute and/or conceal the scheme, payments/sharing of payments between them, records of financial transactions, and records reflecting financial circumstances that either reflect motives for the schemes and/or disposition of the proceeds of the schemes.  Similarly, such subjects create and retain such records in both digital format, e.g., on computers and smart phones, as well as in paper format, e.g., records of bank transactions, mail matter, and the like, such as the bank records founds during the execution of the search warrant at MUCHIMBA's residence.  Therefore, given that MUCHIMBA was leaving the country and did not have plans to return, there is reason to believe that he may have brought with him evidence, fruits, instrumentalities, or proceeds relating to the TARGET OFFENSES are located on the TARGET DEVICE and in his LUGGAGE.  Moreover, based on my training, experience, and research, I know that the TARGET DEVICE in Attachment A may have capabilities that allow it to serve as a wireless telephone, digital camera, portable media play, GPS navigation device, and storage device, among other features.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

36.     Moreover, it is well-known that virtually all adults in the United States use mobile digital devices. In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that that same 2019 report estimated that 81% of Americans use at least one smartphone. *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Jan. 9, 2021).

37.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of federal law have been

committed by MUCHIMBA and possibly others.  There is also probable cause to search the TARGET DEVICE and LUGGAGE, further described in Attachment A, for the things described in Attachment B.

## TECHNICAL TERMS

38.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic,

18

or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

        b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

        c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets

function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

        d.    A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.    "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security

software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

       f.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

       g.     Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

       h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

       i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon

the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

   j. A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

   k. A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

   l. "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable.  For example,

www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i.      When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

ii.      Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

o.      "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC
## STORAGE, AND FORENSIC ANALYSIS

39.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the DEVICES, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the TARGET DEVICE for at least the following reasons:

a.      Individuals who engage in criminal activity, including the offenses under investigation here, use digital devices, like the TARGET DEVICE, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the TARGET DEVICE, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to

25

that of their new digital devices, so as not to lose data, including that described in the foregoing

paragraph, which would be valuable in facilitating their criminal activity.

          c.      Digital device files, or remnants of such files, can be recovered months or

even many years after they have been downloaded onto the medium or device, deleted, or viewed

via the Internet. Electronic files downloaded to a digital device can be stored for years at little or

no cost. Even when such files have been deleted, they can be recovered months or years later

using readily-available forensics tools. When a person "deletes" a file on a digital device such as

a home computer, a smart phone, or a memory card, the data contained in the file does not actually

disappear; rather, that data remains on the storage medium and within the device unless and until

it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in

free space or slack space – that is, in space on the digital device that is not allocated to an active

file or that is unused after a file has been allocated to a set block of storage space – for long periods

of time before they are overwritten. In addition, a digital device's operating system may also keep

a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via

the Internet are automatically downloaded into a temporary Internet directory or "cache." The

browser typically maintains a fixed amount of electronic storage medium space devoted to these

files, and the files are only overwritten as they are replaced with more recently viewed Internet

pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends

less on when the file was downloaded or viewed than on a particular user's operating system,

storage capacity, and computer, smart phone, or other digital device habits.

          40.     As further described in Attachment B, this application seeks permission to locate

not only electronic evidence or information that might serve as direct evidence of the crimes

described in this affidavit, but also for forensic electronic evidence or information that establishes

how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in the TARGET DEVICE at issue here because:

       a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence

in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

   b. Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

   c. A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.      I know that when an individual uses a digital device to make a remote deposit of check into a bank account, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

**METHODS TO BE USED TO SEARCH DIGITAL DEVICES**

41.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software    applications, each generating a particular form

29

of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

31

e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use

whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

42.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.     The TARGET DEVICE, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.     The analysis of the contents of the TARGET DEVICE may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.     In searching the TARGET DEVICE, the forensic examiners may examine as much of the contents of the digital device as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment

33

B.   Any search techniques or protocols used in searching the contents of the Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

## CONCLUSION

43.     Based upon the above-referenced facts, your affiant asserts that there is probable cause to believe that the TARGET DEVICE and LUGGAGE contains evidence of the TARGET OFFENSES.

44.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

45.     I further request that the Court permit the search warrant to be executed at any time given that the TARGET DEVICE and LUGGAGE are contained on the premises of the Treasury Inspector General for Tax Administration.

Respectfully submitted,

*Mark Montoya*

_____
Special Agent Mark Montoya
U.S. Postal Service Office of the Inspector General

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by
telephone on November 20, 2023.

_____
HONORABLE MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE